Next case, Your Honor, is number 15-14377, Warren Bingham v. Supervalu. Mr. Garrick. Good morning. Josh Garrick on behalf of the estate of Marion Bingham. If it pleases the Court, I would like to reserve two minutes of rebuttal time. Yes, you may have it. Okay, thank you. The District Court erred in two key ways here in this case in issuing summary judgment against my client. First, and most importantly, they ignored and completely disregarded the statutory language that addresses when a particular entity is subject to liability under Chapter 176D. And the second error that they made was by disregarding the reasonable inferences in the facts that could be drawn in favor of my client concerning the role that Supervalu played in adjusting the claim against Shaw's Supermarkets. As far as the statutory language is concerned, the statute is very clear. It says that 176D liability attaches to and lists corporations, individuals, et cetera, et cetera, et cetera, and any other legal entity or self-insured which is engaged in the business of insurance, including agents, brokers, and adjusters. And here, in responding to interrogatories, Supervalu conceded that they adjusted this claim. The inquiry should end right here. This Court need Well, let me say, let's say you have a very good argument that they provided insurance services to their subsidiaries in the form of claim adjustment. And, in fact, they provided insurance by risk spreading. But that doesn't seem to get you all the way there under the statute. The statute says they have to be engaged in the business of insurance. So if you've got entities that are insuring each other but they're not doing it for profit, how do you get over that hump? Well, there's many ways. And, first of all, the statute says that they're engaged in the business of insurance, including, and then it gives these three Right, but everything after the including is all under the subheading business of insurance. Sure. So the reason why this is the business of insurance is because that's precisely what they're doing. And taking a step back, and this goes to the factual inferences here, the facts show that they were engaged in the business of insurance. They were allocating and spreading risk across 228 Well, now you're back to saying they performed functions that could be described as insurance. And let's assume you're correct. You can perform functions, you know, I could go out on the street here and hand someone some candy. I'm distributing candy, but I'm not in the business of selling candy. How do you say that when they solicit no customers, they issue no policies, they gain no profits? How are they engaged in the business of insurance? Well, they do. And, first of all, it is conceded that they are a for-profit business. Sure, but there are other stuff. Sure. The second thing is they I lost my train of thought. So they are engaged. I think the best analogy would be to look at something like a 93A claim. If you look at 93A, because technically that's what we have here, you look at, well, what's the business context? If someone is engaged in business or commerce, they're covered under 93A. And that's what the Posnick case said. The Posnick case said that the MMPIA, the insurer in that case, wasn't in the business of insurance because it was a legislative mandated and so forth. But here, once the decision is motivated by profit, so if there was a loss, it would show up on the books of SuperValue, not on Shaw's. If there was a surplus, it would, again, show up on SuperValue's books, not on Shaw's. Here, where there was a malpractice claim and that check was paid to SuperValue and it didn't go to Shaw's, that gets them to be within the business of insurance. The second way that they're in the business of insurance is by looking at I just, the facts don't support that conclusion. What profit motive was there for SuperValue to earn profit from selling or engaging in insurance? It wasn't the earning profit by doing this, it was by saving costs by doing it. And that ultimately would show up as either a profit or loss. That's a business-making decision. Well, isn't that the case with any self-insurer? The whole purpose of self-insurance, you have an umbrella, you have self-insurance underneath. The only difference that you're arguing is if Shaw's did this itself as opposed to a parent doing it, that makes the difference, that makes it a business? Yes. Well, on what basis does that make it a business? Well, all the decisions where there's a third party that's been interposed between the tortfeasor and the claimant, they all hold that 170-60 applies. If you look at the Miller case... But that's where those, they're being held in between someone who is engaged in the business of insurance. And here, by serving as either an insurer, so the facts aren't clear whether they are an insurer, whether a third party administrator, but courts have routinely held third party administrators to be engaged within the business of insurance, and that's precisely what has been judged at all. It's the reverse. So you look at this and say, well, Morrison might apply because it's a self-insurer, but we look at it the other way, and we say, well, if they were a third party insurer, and they would have been subject to 170-60 applying, what's the difference whether or not it's, the corporate form should have no bearing on whether, on that distinction? Are you saying that anytime you have self-insurance, that you run the risk of being an insurer? Anytime? If Shaw's did it directly, and they were slow, they were mean, they were miserable, they were difficult to deal with in a case which was a slam dunk, that they're responsible as an insurer? So in that situation, no, and the reason why is because the SJC has created this narrow carve-out under the Morrison decision, and that it applies solely to a pure self-insured entity that is engaged, that's adjusting their own losses, and that didn't happen here because of the third party. What SuperValue is asking you to do is to extend that narrow exemption which deviates from the statutory language, and respectfully, that shouldn't happen, because the language is clear, number one, but number two, if that were to happen, then this case should be certified to the Supreme Judicial Court, and the Supreme Judicial Court would be the one to make that policy decision. The last time there was an exception that was made prior to the Morrison case was the Posnick case. After Posnick carved out this narrow exemption... We did. We did. And was there an explanation? Was there an opposition? There was. There was an opposition, and the court rejected it, essentially saying that we were trying to take two bites of the apple, but respectfully, our position is the statutory language covers. However, to the extent that SuperValue seeks an extension of this Morrison application, that's something that should be handled by the Supreme Judicial Court. Suppose they centrally bought the paper for all the subsidiaries and distributed it to them so they could get a better bulk value by buying the quantity. Are they in the paper selling business? I would think not. No, but... Well, aren't they just doing the same thing here with insurance? They're within the corporate family. They're centralizing the self-insurance function. But where that strays from that is twofold. The first reason is, if I may just finish the question, the first reason is that these 228 entities that they serve, not all of them are affiliated, and so that brings them within the business of insurance. The second thing is this risk planners idea where they actually were engaged in the business of insurance because SuperValue had controlled one of the largest insurance brokerages in the country. But that seems to have nothing to do with the present question before us. You will still have your two minutes. Okay. Did you want me to respond? No. Okay. In the two minutes, you may. May it please the Court, Wesley Chusid for the appellee SuperValue. Your Honor, the district court got it right. If I may say, this is a perfect example of the plaintiff appellant. They're trying to put a square peg in a round hole. My client, SuperValue, is a supermarket store. They have 1,125 stores around the country. They have centralized, as you obviously know, all the claim administration in one place. Why? Because they're smart business people. They realize savings, economies of scale by centralizing all the costs of administering and paying claims into one place. They don't charge premiums. They don't have any contractual obligation to pay any claim. They don't make a profit. If you look at Chapter 176- Didn't they assume the obligation to pay this particular claim in the corporate transaction where the store was acquired? No. They bought the stores like any other corporate transaction. And in doing that, they, whatever liabilities all these 1,125 stores had, indirectly become a liability of the corporate parent. In that sense, yes. I thought the corporate transaction, they specifically- I mean, you don't automatically assume liabilities when you buy a corporation. But I thought in this transaction, the briefs told us that they assumed the liabilities of Shaw's. There was no express assumption of any Shaw's liability any more so than the other 1,100 stores. They voluntarily- That's hardly a yes or no answer. No. They voluntarily administer these claims in one centralized function to save money like any buying paper in bulk saves the corporation money. Administering claims in bulk saves the corporation money. That doesn't mean they're making a profit. They don't charge for premiums. There is no contractual obligation in all the cases that the plaintiff relies upon, particularly the Miller case. There was an insurance company which was created by the Harvard Medical School. And there was also a claim administrator, risk managers, which was also created by the Harvard Medical School. There was a contractual duty there on the part of the insurance company to pay the claim. We don't have any such duty. They don't have any expert that says they were in the business of insurance. What we have is a business decision by a supermarket that clearly is not in the business of insurance under 176D, trying to save corporate expenses and economize in that manner. The business about risk planners. Yes, they owned risk planners. Owned in the past tense, I should say. They sold it in 2009. Risk planners, as Your Honor noted, risk planners had absolutely nothing to do with this claim. Insofar as the different corporate entities are concerned, the SJC in Morris and Toys R Us already looked at that. In fact, if you look at the decision, you'll see that in that case, the court specifically refers to Toys R Us and its subsidiaries and parent corporation, which they're referring to as toys in the collective manner. And they are not making a corporate distinction there. They are treating them all as one. And the SJC recognized in Toys R Us, Morris and V Toys R Us, that this is a corporate function. Whether they are an insurance company or in the business of insurance, I think the fact that they already had insurance puts that issue to rest once and for all. SuperValue and all its subsidiaries already had insurance policies with Lexington, with National Fire, subject to a $2 million SIR. They can't be in the business of insurance and buy insurance for themselves at the same time. They did it for a reason. And to what Massachusetts authority do you rely on most or direct us in terms of defining the term business of insurance? Morris and V Toys R Us and the Posnick case. In both of those cases, the SJC talks about premiums, contracts, particularly contracts. There is no contract here. Has Posnick been affected by subsequent statutory enactments? Not on this issue. No, Your Honor. It has not. So the SJC has addressed this. This is nothing new. What they are trying to do is that clearly they want to get a second bite at the apple. I get that. My client understands that. But from day one, from when we responded to that Chapter 93A letter, we said, look, you have no 93A claim because we are not in the business of insurance. We cited the Morrison case in our 93A response letter. They had it before they filed this lawsuit. They did file, as we just heard, a motion to certify questions to the SJC. And we opposed it then. We oppose it now for two reasons. One is not every question of law must be referred to the state court. You already have all the governing SJC law you need. You have the ingredients to make a decision here and to grant our summary judgment. There is nothing earth shatteringly new. Yes, I suppose if you drill down to every little factoid that they cite, most of which are immaterial, by the way, it may be differentiated. But when you look at the real issues in the case, the real issues in the case have been addressed in the Morrison case. The other issue, the other basis for our opposition to the motion to certify, is that we felt and still feel this is an end run around the removal. This case was filed in the state court. We removed it on the basis of diversity. We feel and still do contend that this certification to the state court, under these circumstances where they already have pronounced their law on this topic, is an end run around the jurisdiction of the federal court. Thank you, counsel. Thank you, Your Honor. If I may, just by addressing one factual point, you had asked whether or not SuperValue had acquired the liability. And out of the statement of facts that were drafted by SuperValue, they said, through its subsidiary acquisition of Albertson SuperValue, acquired the potential liability related to the plaintiff's claim against Shaw's. So when he said, no, that didn't happen, that actually did happen, that's out of their statement of facts, which we admit that's on page 281 of the record. I want to address, Judge Lynch, your point about risk planners being unrelated. And I think that's the problem here, is that the beginning of my argument, we're talking about, well, what's the business of insurance? And so we then say, well, we have the business of insurance, because even though it was unrelated to the claim, that it wasn't risk planners that was adjusting the Shaw's loss, SuperValue was engaged in the business of insurance. It's like if Liberty Mutual, for example, sold a, they had a workers' comp policy and they were adjusting some loss for their own, for their employee, because by virtue of engaging in insurance-related activities, they would be covered by the statute. All right, I understand the argument. Do you have something more to say? Sure. Well, not on that, the only other thing I'll say is that, again, they rely on this contract and this contract of insurance and this profit decision-making. We rely on the statute. And if they want an extension of the Morrison application, that's something that respectfully should be addressed by the Supreme Judicial Court. Okay, thank you. Thank you. Counsel, do you want a chance to respond to what's in the record? Your Honor, yes, Your Honor. On this issue about did they acquire the liability or not, we said from the beginning, when we acquired New Albertsons, which owned all the stores, yes, we acquired any liabilities of the stores, but not on a specific case by case. Each store is a separate corporate entity, yes. So indirectly, and I thought we said that in the statement of facts, they acquired these liabilities of the stores. Okay. And we're not denying that part, and that's not where our argument goes. Okay.  Thank you, Your Honor.